```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
     v.                             )    Criminal No. 12-10344-PBS-2
                                    )
JOSHUA GONSALVES,                   )
                                    )
     Defendant.                     )
                                    )
_____ )
```

## MEMORANDUM AND ORDER

July 25, 2014

SARIS, C.U.S.D.J.

### I. INTRODUCTION

Defendant Joshua Gonsalves, charged with various counts in connection with an alleged money laundering and oxycodone-trafficking conspiracy, moves to suppress all evidence obtained as the result of a warrantless stop of his motor vehicle by police on February 27, 2012. Defendant contends his Fourth Amendment rights were violated because the police lacked reasonable suspicion or probable cause to believe that he was committing a crime, and that the subsequent search and seizure were unreasonable. At the evidentiary hearing on June 20, 2014, Barnstable Detective and DEA Cape Cod Drug Task Force Agent Mark K. Butler testified for the government. After hearing, the

1

Defendant's Motion to Suppress (Docket No. 174) is **DENIED**.

## II. FINDINGS OF FACT

The following facts are drawn from Detective Butler's testimony and his signed affidavit, which was admitted into evidence at the hearing.

**1. The Investigation**

Beginning in 2011, the DEA Cape Cod Drug Task Force ("CCDTF") began to investigate the oxycodone trafficking activities of Joshua Gonsalves and his brother, Stanley. Investigators also obtained information relating to Joshua Gonsalves's oxycodone trafficking activity through wire intercepts and text messages provided by cooperating defendants in a related case arising from an FBI investigation.[1] During the course of the investigation, several informants and cooperators identified Joshua and Stanley Gonsalves as major oxycodone distributors operating on Cape Cod.

In October 2011, a confidential informant (CS-1) notified investigators that an associate of Gonsalves planned to drive off-Cape to purchase oxycodone. Investigators followed the vehicle from Cape Cod to Haverhill and back. Afterwards, CS-1 confirmed to investigators that the oxycodone had arrived. On November 8, 2011, another confidential source made a controlled

---

[1] See United States v. John Willis, et al., No. 11-cr-10212-JLT (D. Mass.).

purchase of oxycodone pills from Gonsalves and his girlfriend Katelyn Shaw. Later in November, CS-1 informed investigators that the same Gonsalves associate was again planning to drive off-Cape to purchase oxycodone. Based on this information, they stopped the vehicle driving westbound on Route 6 and seized about $69,000 in cash from the vehicle.

On February 2, 2012, CS-1 made a controlled purchase of oxycodone from defendant. Then, on February 25, 2012, CS-1 informed investigators that defendant planned to travel to the New Bedford area to purchase oxycodone from his usual supplier. According to CS-1 and another informant, this supplier had been Joshua Gonsalves's primary source of oxycodone pills during the fall, providing him with thousands of pills. These purchases continued through February. CS-1 stated that defendant planned to pick up approximately 2,000 oxycodone pills from the supplier, and that defendant would travel in a black Cadillac with Shaw. However, due to problems collecting enough money, CS-1 informed investigators the next day that the trip was delayed.

**2. The Stop**

On the afternoon of February 27, 2012, CS-1 advised authorities that Gonsalves had collected the additional money, and that, as planned, Gonsalves would drive from Cape Cod at about 4:30 p.m. to the New Bedford area in his black Cadillac with Shaw to purchase oxycodone from the supplier.

Shortly after receiving this information, at 4:50 p.m., Barnstable Detective Lieutenant Sean Balcom and others began following a black 2005 Cadillac as it traveled westbound on Route 6 off the Cape. Gonsalves was driving. The detectives followed the vehicle to Acushnet, Massachusetts, which borders on New Bedford. Detectives observed Gonsalves pull into a driveway and park next to a white Infiniti. The detectives recognized the white Infiniti by its license plate number because the suspected oxycodone supplier had been previously stopped by Falmouth police while operating the same vehicle. Gonsalves, Shaw, and an unidentified woman entered the home. Detectives conducted surveillance of the Cadillac until approximately 8:00 p.m. when they reentered the Cadillac to make the homeward trek.

Barnstable detectives followed them back to Cape Cod intending to stop the vehicle to investigate drug trafficking regardless of whether there was traffic violation. Two officers stopped the Cadillac (which they said was traveling 65 m.p.h. in a 55 m.p.h. zone), and told Gonsalves he was being stopped for speeding.[2] Gonsalves identified himself, with his license, but did not provide the vehicle's registration. The woman in the passenger seat identified herself as Shaw and the woman in the rear identified herself as Arianna Tavares. There was no furtive conduct and Gonsalves was cooperative. However, Detective York,

---

[2] There is a dispute as to whether Gonsalves was speeding.

who made the stop, had been told by Detective Lieutenant Balcom about the ongoing criminal investigation into oxycodone trafficking, and that in Balcom's view there was probable cause to search the vehicle for drugs. The officers ordered the occupant to exit the vehicle because of suspicions of drug trafficking (not due to the speeding violation).

Gonsalves refused to consent to a search of the Cadillac. As instructed by Balcom, York asked Gonsalves to step out of the vehicle. Gonsalves complied. Officers frisked Gonsalves and found a large wad of cash in his pocket.[3] Shaw and Tavares exited the vehicle as well. Officers began to search the interior of the Cadillac. They found some paperwork, clothing, and other items but determined that it was too dark to complete the search for drugs. There were no drugs or guns in plain view. Officers informed the parties that a drug-sniffing dog was en route. Before the drug-sniffing dog arrived, two officers witnessed Shaw throw an object towards the nearby woods. Officers found a plastic bag which York recognized to be 15-milligram oxycodone pills. A later count indicated the bag contained 265 pills. The stop of the vehicle lasted about twenty minutes before authorities discovered the tossed bag of oxycodone pills.

---

[3] Gonsalves said it was $1,500. Officers later counted the cash, which totaled $6,523.

Shaw was placed under arrest at the scene. A patdown search of Shaw revealed another fifteen oxycodone pills on her person. They were transported to the Barnstable Police Department. A full inventory search of the Cadillac at the Barnstable Police Department revealed $16,670 in cash hidden in a speaker box in the Cadillac's trunk and a digital scale in the center console.

### **III. CONCLUSIONS OF LAW**

Defendant argues that the police lacked reasonable suspicion to believe that Joshua Gonsalves was committing a crime when they stopped his car. The government responds that it had both probable cause and reasonable suspicion to believe he was engaged in drug trafficking, and in any event he was speeding.

To satisfy the requirement of the Fourth Amendment that an investigatory stop of an automobile is reasonable, police officers must have a reasonable suspicion that a person is engaged in some illegal activity. United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012). Information provided to police by third parties, like informants, may create reasonable suspicion, if the information has sufficient indicia of reliability. Id. "The past reliability of an informant is a significant factor permitting reliance on information that would not otherwise be sufficiently corroborated." Id. at 621-22.

The court conducts a two-part inquiry to determine the objective reasonableness of the stop and search: "The police are

6

not allowed to make an initial stop unless they have a reasonable, articulable suspicion about an individual's involvement in some criminal activity. If the initial stop passes muster, actions undertaken during the course of the stop must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation." United States v. Arnott, --- F.3d ---, No. 13-1881, 2014 WL 2959288 at *3 (1st Cir. July 2, 2014) (internal citations and quotation marks omitted).

Reasonableness requires a practical, commonsense determination. United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008). It requires more than a mere hunch, but less than probable cause. Arnott, 2014 WL 2959288 at *3. Between these two guideposts, reasonable suspicion is determined "in light of the totality of the circumstances." Id. (citing United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)).

With respect to phase one, I find the police had reasonable suspicion that Gonsalves was involved in drug trafficking. The officer's initial stop was justified by information provided by an informant of established reliability.[4] The police conducted a controlled buy of oxycodone by CS-1 from Gonsalves. CS-1's

---

[4] The government contends that the stop of Joshua Gonsalves was independently justified by an alleged speeding violation. If this stop were just based on a traffic stop, the analysis of the frisk and scope of the search would be different.

information about the pattern of purchases from this supplier was confirmed by a stop of a Gonsalves associate the previous November. At this point, the details of this trip under surveillance were generally consistent with CS-1's information.

The next issue is whether the scope of the search was reasonably related to the initial stop. Police conducting a <u>Terry</u> stop in a drug investigation are entitled to take reasonable measures to protect their safety, like frisking the driver and/or passengers and searching the car for guns. The police had strong reason to believe Gonsalves had just concluded a drug transaction. The connection between guns and drugs is "legendary". <u>Arnott</u>, 2014 WL 2959288 at *4. It was dark out. The frisk of Gonsalves revealed a large quantity of cash in his pant pocket, which in the circumstances, under the fellow officer rule, the police reasonably believed was carried to purchase oxycodone. <u>See</u> <u>United States v. Chhien</u>, 266 F.3d 1, 8 (1st Cir. 2001) (discovery during consensual pat-frisk of large "bulge" of cash totaling $2,000 in defendant's pocket "understandably escalated" officer's suspicions of criminal activity). There is no challenge to the frisk of Gonsalves's person if the stop was reasonable. <u>See</u> <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375-77 (1993) (discussing tactile discoveries of contraband during the lawful patdown of clothes during a <u>Terry</u> stop). The detention of the car to wait for a K-9 drug-sniff was also reasonable because

the car was too dark to search thoroughly for drugs. Cf. United States v. Vaughn, 700 F.3d 705, 710-12 (4th Cir. 2012) (reasonable suspicion of criminal activity justified extension of stop until K-9 unit arrived). While an officer "must work purposefully to confirm or dispel his suspicions" of criminal activity, "there are no hard time limits" on the length of a stop. United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011).

While waiting, two officers witnessed Shaw throw a plastic bag containing oxycodone pills. At that point, the officers had probable cause to arrest Shaw and the others in light of all the information available to the police. The police were entitled to search the car incident to the arrest. See Arizona v. Gant, 556 U.S. 332, 343-44 (2009) (holding that the search incident to arrest exception applies to a vehicle search when there is "reason to believe evidence relevant to the arrest may be present in the vehicle).

I find that the twenty-minute roadside stop was justified by reasonable suspicion based on information provided by a confidential informant of established reliability and that the stop and search were reasonable in scope and duration in light of the unfolding circumstances.[5]

---

[5] Because reasonable suspicion justified the search and seizure by police up until the oxycodone was discovered, the Court need not determine whether CS-1's information also

## IV. ORDER

Defendant's Motion to Suppress (Docket No. 174) is **DENIED**.

                                                /s/ PATTI B. SARIS
                                                Patti B. Saris
                                                Chief United States District Judge

---

established probable cause. See Arnott, 2014 WL 2959288 at *2 (noting that probable cause analysis "elevates the bar higher than necessary" when the case may be properly treated under Terry reasonable suspicion analysis).