UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim **No. 1:12-cr-10344-PBS** |
| | ) | |
| JOSHUA GONSALVES | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM
### (WITH ATTACHED EXHIBITS)

Joshua Gonsalves is a 34-year-old man whose decision to
participate in a conspiracy to sell drug and launder money was, while
wholly irresponsible, emblematic of his inability to break his struggle with
his criminally addictive behavior brought about by his undisputable and
dysfunctional childhood and teenage years.  Joshua's paternal guidance
and tutelage began with periods of intense physical and emotional abuse
by his step-father during his formative late childhood and early teenage
adolescence years and was ultimately replaced by male "parenting" by his
best friend, Vincent Alberico's father, George Upton, a career offender
criminal, who provided emotional and financial support to him in
exchange for Joshua's participation in robbery crime sprees organized by
Upton.  Much of his teen and young adult years was spent committing
petty street-level crime with his peers, including his brother, Stanley, all
led by the parent of one of those peers.  His participation in a series of
burglaries with Upton, Alberico and others caught up to him years after
the commission of those crimes when one of his peer participants
cooperated with state prosecution, propelling him towards his first prison

sentence.  Indeed, his criminal activity was "normalized" by the support system of individuals similarly engaged in rogue and criminal activity. Without real adult guidance, Joshua was left unprepared to fight the impulse to engage in criminal behavior that mandated involvement with undesirable companionship and associated behaviors.  However, Joshua's self-directed and tangible efforts to gain insight into his impulse towards criminal behavior in order not to repeat them demonstrate that the draconian period of incarceration called for by the government and probation is unwarranted.  For the reasons that follow, Joshua Gonsalves submits that a sentence of 120 months imprisonment, with a six-year period of supervised released that include specific conditions to address the defendant's substance abuse and addictive conduct to follow is consistent with the factors set forth in 18 U.S.C. § 3553 (a) and will result in a sentence that is sufficient, but not greater than necessary, to effectuate the purposes of sentencing.  United States v. Kimbrough, 128 S.Ct. 558 (2007); United States v. Booker, 125 S.Ct. 738 (2005); United States v. Martin, 520 F.3d 87 (1st Cir. 2008); United States v. Rodriguez, 527 F.3d 221 (1st Cir. 2008).

## BACKGROUND

The defendant's childhood and personal circumstances are thoroughly detailed in the Presentence Report.  While acknowledging acceptance of responsibility for his own decisions to participate in criminal behavior, the defendant's late childhood and early teenage years were

bereft of meaningful and non-criminal adult guidance and unquestionably contributed to his lack of self-awareness and control.  The defendant self-medicated his pain by experimenting with, and then abusing a number of illicit narcotics and alcohol that contributed to events that created a juvenile and then adult criminal record that is notable for the number of misdemeanor and minor felony offenses that underscore negative behaviors committed while abusing alcohol and drugs, many of which were dismissed.  As previously noted, Joshua Gonsalves' primary paternal imprimatur of physical and emotional abuse by his step-father in his late childhood and early teen years was dangerously replaced by Vincent Alberico's father, a career criminal offender, who took Joshua under his wing and abused his young trust in exchange for Joshua's participation in a string of robberies on the Cape.  Although his prosecution of these offenses did not take place for several years when his peer, a co-defendant in the case, ultimately cooperated with the prosecution in exchange for leniency, Joshua's life prior to his incarceration in state prison could be described as a balance of efforts to engage in normal behavior such as working as a mason with self-medicating and criminal behaviors.

## The Investigation Leading to This Indictment

The investigation and ultimate prosecution of Joshua Gonsalves was a product of the investigation against Stanley Gonsalves and became a separate and additional focus of an FBI-led investigation following the federal indictment of thirteen defendants on oxycodone

trafficking conspiracy charges on May 26, 2011, in <u>United States v. John Willis</u>, No. 11-cr-10212.    The lead defendant in the <u>Willis</u> case was Cantonese-speaking Caucasian, John Willis ("Willis") of Dorchester, who had long-standing connections with Asian organized crime and violent gangs that once controlled criminal activity in Boston's Chinatown. Willis's nickname, "White Devil," became the name of the overall investigation after Willis's nickname. PSR ¶ 10.

Indeed, the evidence presented at trial was that Stanley Gonsalves and John Willis met at MCI-Concord during their concurrent commitments there from July 2007 and January 2008 when Willis was released. PSR ¶ 20.  When Stanley was released in October 2009, he and Willis, whose drug trafficking and prostitution kingdom was already thriving and in full force, reunited and they developed the structure of their mutually beneficial relationship with Willis at the helm of his operation and Stanley at the helm of his. PSR ¶ 20-24.  By the time that Joshua was released from state prison in September 2010, the infrastructure of Stanley's conspiracy had already been substantially molded and populated by a workforce of associates and minions, including Vincent Alberico, George Dabrolet, Alexa Doran, Russell Hamlyn, Amanda Rancourt, David Gonsalves (Stanley's cousin), Danielle LeBaron, Joshua Martin, Michael Herlihy, and Mathew Hernon.   PSR ¶ 24-42.  Danielle LeBaron testified that when Joshua was released from prison, Stanley held Joshua at arms' length and with some mistrust.

Also, notably, during the period of September 2008 until Willis'
arrest in or around May 27, 2011, in spite of evidence developed from
court authorized Title III electronic surveillance of eight telephones,
including several utilized by the supply-side drug distribution and money
laundering operation of which Willis was the founder and leader, *none* of
the recorded calls even reference Joshua, much less contain his voice.
PSR ¶ 14-16.

Evidence of the magnitude and success of the Willis oxycodone
trafficking conspiracy was presented at the Gonsalves trial and the
material decadence of the successful fruits of that conspiracy, namely
Willis' homes, vehicles and accessories, starkly contrasted with the
depiction of the meager fruits of Joshua's labors, thereby raising serious
questions about the real scope of Joshua's participation in the separate
Gonsalves conspiracy.  Much as the Government seeks to elevate Joshua
to a position of prominence in the conspiracy, a realistic evaluation of the
evidence of Joshua's role in the conspiracy more reasonably compares to
the other couriers who were provided compensation, either in money,
product or in trade, to provide services to the conspiracy.  Many of the
other couriers or intermediary connections involved such as Vincent
Alberico, Crystal Flaherty, and Joseph Guarneri maintained their own
and independently thriving drug distribution operations, profiting from
both their work assignments from Stanley Gonsalves and the fruits of
their own operations.  The evidence presented at trial was that Joshua

Gonsalves, although connected by fraternity to Stanley Gonsalves, almost exclusively took direction from his brother.  Ironically, Willis, whose role as oxycodone kingpin was unassailable, was sentenced to 20 years' imprisonment after he pled guilty to drug and money laundering conspiracies. Cr. No. 12-10212-JLT-1; PSR ¶6(1).  Willis' leadership over a vast number of criminal activities including conspiracy to traffic narcotics, money laundering, prostitution, gambling, at least 12 other indicted co-defendants and countless other non-indicted co-conspirators, all through the use of violence and force, including the use of firearms, to promote his rule over his vast empire for years, far exceeded the criminal behavior and demonstrated benefit derived therefrom that could be fairly attributable to Joshua Gonsalves.

**Offense Level Computation**

Although the jury verdict reflected that Joshua Gonsalves was accountable for 75,000 30 mg. oxycodone pills, the defendant believes that this quantity is somewhat inaccurate and excessive.  The defendant states that the following breakdown is more fairly based upon the credible evidence:

a)    Anevay Duffy: Anavey Duffy could not have delivered and did not deliver oxycodone shipments on behalf of Joshua Gonsalves during the summer of 2010 as he was in state custody until September 24, 2010.  Further, the evidence at trial demonstrated that there were significant discrepancies between the quantities of pills that Ms. Duffy

told investigators that she transported on behalf of Stanley Gonsalves and her testimony at trial.  Duffy testified that she had delivered pills to several people including Stanley Gonsalves, Jason Boyd, John Willis, Brant Welty, and Colby Deering.  She was able to recall possibly a dozen deliveries to Joshua Gonsalves, two of which were in the company of Michael Shaw.  Accordingly, Joshua Gonsalves calculates that he is accountable for 12,000 pills.

b)     Michael Shaw:  Shaw's testimony at trial was notably inconsistent with his grand jury testimony, to which he acknowledged at trial, that he delivered pills five times to Joshua Gonsalves, two of which were in the company of Duffy.  Accordingly, Joshua Gonsalves calculates that he is accountable for 9,000 pills.

c)     Kevin Baranowski, Peter Melendez, Rick Ross, Steven Le, Brian Garner and Christina Gonsalves, and Vincent Alberico:  Joshua Gonsalves denies any accountability for these pills as the pills attributed to these indicted and unindicted co-conspirators preceded Joshua's participation in the conspiracy as a result of his incarceration in state prison on state criminal offenses.

d)     Francisco Monteiro:  In addition to the jury's acquittal of Joshua of the indictment relating to the events involving Francisco Monteiro on May 13, 2011, namely possession of a firearm in furtherance of the conspiracy, there was no credible evidence presented at trial that Joshua Gonsalves was present for and/or participated in the alleged

transaction with Francisco Monteiro even under the lens of the standards of fair preponderance of the evidence.  Joseph Guarneri conceded at trial that when presented with a photograph of Joshua Gonsalves during his proffer interviews regarding the event in question, Guarneri was unable to identify Joshua Gonsalves as the individual with Stanley Gonsalves and Guarneri described the second individual (who the Government alleges was Joshua) as "Portuguese looking", (olive skin and dark eyes) rather than the blue eyed and light skinned Joshua Gonsalves.  When first interviewed on February 2, 2013 by law enforcement officials from the Drug Enforcement Agency in connection with the alleged events involving Monteiro on 5/13/11 and then re-interviewed by DEA law enforcement and Assistant U.S. attorneys prosecuting Francisco Monteiro, Guarneri never mentioned Michael Fula or a gun attributed to him, never mentioned a female in the car, never mentioned that a gun had been retrieved from Stanley, never mentioned the presence of the other black males in Monteiro's house, never mentioned that Stanley was hit by LG, and never mentioned a car chase. Fula's testimony was equally unreliable, particularly with respect to the alleged "pit maneuver" that would have been necessarily done by the female driver, if any of his testimony was to be believed.  The jury clearly discredited both Fula and Guarneri when they acquitted both Joshua and Stanley Gonsalves regarding the alleged possession of a handgun during the May 13, 2011 alleged events.  Finally, the court should

completely disregard any alleged statements attributed to Brian Frost. The Government has provided no competent and reliable evidence to corroborate Frost's alleged statements, and made no effort to compel Frost's attendance at trial although they had the ability to do so.

e)      Miguel Jordan: Katelyn Shaw was asked to estimate the number of pills delivered by the government when she was interviewed. (See Exhibit 2)  Therefore, the estimated pill quantity by the government and probation is flawed and a more conservative estimate is warranted. Accordingly, Joshua Gonsalves calculates that he is accountable for 15,000 pills.

f)      Daryl Durden: Similarly, Katelyn Shaw was asked to estimate the number of pills delivered.  Therefore, the conclusion regarding the pill quantity by the government is flawed and a more conservative estimate is warranted.  Accordingly, Joshua Gonsalves calculates that he is accountable for 2,000 pills.

g)      J. Gonsalves and K. Shaw:  Joshua Gonsalves agrees that he is accountable for 140 pills during this arrest.

Finally, notwithstanding the court's ultimate determination of the quantity of pills reasonably attributable to Joshua, the evidence at trial was uncontroverted that many of the pills sold were 15 mg. instead of 30 mg., thereby reducing the quantity in question.  Accordingly, Joshua Gonsalves states that he believes that he is accountable for 38,140 pills.

**There is No Credible Evidence that Joshua possessed any dangerous weapons pursuant to USSG §2D1.1(b)(10**

Joshua should not receive a two level increase because there was no credible evidence that he possessed any dangerous weapons pursuant to USSG §2D1.1(b)(10. Joshua restates his argument previously presented regarding the lack of credible evidence presented by the Government during the trial regarding testimony from Michael Fula (who was subsequently rearrested and is currently held at Plymouth County Hosue of Corrections) and Joseph Guarneri regarding the alleged firearm and use of a "pit maneuver" during events claimed on May 13, 2011. Further, the Court should disregard any testimony by Crystal Flaherty as any evidence that Joshua possessed any firearm. Matthew Hernon and Alexa Doran testified that the rifle, which was kept behind the couch at the Onset apartment, belonged to Stanley and they only saw it in his possession. Their testimony contradicted Crystal Flaherty's unreliable testimony that she saw the rifle under a bed where Joshua Gonsalves slept. The jury clearly did not credit Crystal Flaherty's testimony and found Joshua Gonsalves not guilty of possession of a firearm in furtherance of a drug conspiracy relating to the rifle and the Court should find her testimony equally wanting under the standard of fair preponderance of the evidence. The Court should not consider any out-of-court statements allegedly attributed to Sameer Ghandi, who was available to be called by the Government as a witness, but the Government declined to do so. Further, there is no credible and

independently corroborative evidence that Joshua Gonsalves had access

to a handgun, that such a Hyannis storage locker existed as claimed by

the Government, or that Joshua directed Ghandi to provide the handgun

to Marcel Young.

### There is No Credible Evidence that Joshua Used Fear, Impulse, Friendship, or Affection to Induce Family Member to Participate pursuant to USSG §3B1(1)

The evidence presented at trial was that Katelyn Shaw participated

in the conspiracy because, for a period of time, she was a drug addict

and derived a benefit from her participation.  The Court should disregard

any assertions that Joshua threatened Crystal Flaherty to obtain her

participation or for any other reason.  The evidence elicited at trial was

clear that Flaherty had her own thriving drug distribution business that

she defiantly and openly pursued, even after she began cooperating with

law enforcement (who, in effect, fostered an environment of enablement

and permission) and after Joshua was incarcerated for probation

violations prior to and leading up to the indictment.  Indeed, the evidence

elicited at the trial was that Flaherty and Joshua were engaged in a bitter

custody dispute and Joshua was referencing this dispute when he wrote

"kharma is a motherfucker."  Moreover, the Government disingenuously

fails to note that the quoted letter to Flaherty was written prior to his

indictment on his federal case and his knowledge about the federal

investigation against him regarding this indictment.

Joshua Gonsalves asserts that based upon a total offense level of

32 and a criminal history category of VI, the defendant's advisory

Guidelines Sentencing range is 210 to 262 months but the defendant

submits that a sentence of 120 months imprisonment, with a six-year

period of supervised released that include specific conditions to address

the defendant's substance abuse and addictive conduct to follow is

consistent with the factors set forth in 18 U.S.C. § 3553 (a) and will result

in a sentence that is sufficient, but not greater than necessary, to

effectuate the purposes of sentencing.  United States v. Kimbrough, 128

S.Ct. 558 (2007).

### Joshua's Role in the Conspiracy

As previously stated, as much as Joshua was connected by name to

the undisputed leader of the conspiracy, Joshua's role in the conspiracy

was no more than a glorified courier and pill counter.  Although two of his

girlfriends, namely Crystal Flaherty and Katelyn Shaw, participated freely

and engaged in the same behavior, these women were only too interested

in furthering their own addictions (in spite of Joshua's efforts to

circumvent those desires) and, in the case of Flaherty, to develop her own

business as she was ultimately successful in doing.  Although his

relationship with Katelyn eroded after she unceremoniously pocketed his

bail money after he was found in violation of probation and incarcerated,

he continues to maintain a good relationship with her.   If, as the

expression goes, a picture is worth a thousand words, Joshua's net worth,

as depicted by government's own evidence of his material worth, namely

his "ownership" of a used car valued at $9,000, in comparison with the

material accomplishments of Willis and Stanley, speaks volumes about

the relative insignificance of his position within the conspiracy.

### The Impact of Oxycodone Addiction Overall on Sentencing

Although Massachusetts, like many other states, does face a severe

oxycodone problem, it was by no means created or driven by Joshua

Gonsalves.  A fair review of the evidence presented by the Government at

trial indicated that during the period that Joshua was engaged in the

conspiracy to sell oxycodone, Cape Cod was already riddled with willing

and capable oxycodone dealers in addition to Joshua.  Additionally,

although Joshua has been incarcerated since May 2012, heroin and

oxycodone continue to proliferate.  Indeed, the Sentencing Commission

has found that "criminologists and law enforcement officials testifying

before the Commission have noted that retail-level drug sellers prevents

little, if any, drug selling; the crime is simply committed by someone else."

See Fifteen Years of Guidelines Sentencing: An Assessment of How Well

the Federal Criminal Justice System is Achieving the Goals of Sentencing

Reform (2004), infra, at 134.  The evidence at trial certainly highlighted the

number of drug distributors who competed with Stanley Gonsalves (and

Joshua Gonsalves) to further their own business interests.  While

Neonatal Abstinence Syndrome ("NAS") is serious, and evidence of its

impact upon newborns may have increased during the time that Joshua

and others sold oxycodone on the Cape, the documentary evidence

presented by the government shows that 95 percent of NAS is caused by heroin abuse and not oxycodone. *See* Chronicle: Cape Cod's Tragic Secret (WCVB broadcast 11 15/2013).

## ARGUMENT

### A SENTENCE OF 120 MONTHS IMPRISONMENT IS SUFFICIENT BUT NOT GREAT THAN NECESSARY TO EFFECTUATE THE SENTENCING GOALS OF 18 U.S.C. § 3553 (a).

The Sentencing Guidelines no longer are binding on the Court. United States v. Booker, 125 S.Ct. 738 (2005). Instead, under 18 U.S.C. § 3553 (a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2). In so doing, a sentencing court "may not presume that the Guidelines range is reasonable" but, instead, must using the factors set forth in § 3553 (a), "make an individualized assessment based on the facts presented." Gall v. United States, 128 S.Ct. 586, 596 (2007). Thus, district courts are now permitted to and, in the appropriate case, directed to consider whether disagreement with the Sentencing Commission's underlying policy results in a sentence that is unreasonably high. Kimbrough, supra, 128 S.Ct. at 575; United States v. Boardman, 528 F.3d 86 (1st Cir. 2008); Martin, supra, 520 F.3d at 93-94.

The First Circuit has stressed that Kimbrough requires a "more holistic inquiry" than simply relying on the sentencing guidelines and that "section 3553 (a) is more than a laundry list of discrete sentencing

factors; it is, rather, a tapestry of factors, through which runs the tread of an overarching principle." United States v. Yonathan Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008).  That overarching principle is to "impose a sentence sufficient but not greater than necessary."  Id.  In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." Id. (Emphasis added).

In this case, the 360 months to life guideline sentencing range suggested by the career offender guideline should be given minimal weight in determining the sentence Joshua Gonsalves receives; instead, the now-familiar § 3553 (a) factors dictate a sentence of 120 months.

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Offender

#### (a) Nature and Circumstances of Offense

The offense conduct here is serious, and the defendant was a participant in a conspiracy that delivered thousands of oxycodone pills to drug-addicted members of the community.  However, although Joshua Gonsalves (hereinafter referred to as "Joshua") was the brother of Stanley Gonsalves, the unquestionable leader of the conspiracy, much like many of the other participants, Joshua was no more than a glorified courier and pill and money counter.  The circumstances of the offense, although serious, should be put in the context with the financial and personal milieu in which Joshua found himself.

**(b) Joshua's History and Circumstances**

Joshua is a 34-year-old United States citizen whose decision to participate in the offense at issue was, while wholly irresponsible, emblematic of his struggle brought about by his wholly dysfunctional childhood and teenage years.  As previously stated, periods of intense physical and emotional abuse by Joshua's step-father during his formative teenage adolescence years, propelled Joshua towards his best friend, Vincent Alberico's father, George Upton a career offender criminal, who became a de facto father figure for Joshua (and, to some extent, Stanley Gonsalves) and provided emotional and financial support to him in exchange for Joshua's participation in robbery crime sprees organized by Upton.  Not surprisingly, this lack of stability and meaningful adult guidance led to a merry-go-round of life on the streets, criminal court appearances, inconsistent real employment and short jails sentences.  Indeed, what little support existed was negative; much of his teen and young adult years was spent committing petty street-level crime with his brother and his peers, all led by the parent of one of those peers.  Indeed, his criminal activity was "normalized" by the support system of individuals similarly engaged in rogue and criminal activity.  Without real adult guidance, Joshua was left unprepared to fight the impulse to engage in criminal behavior, undesirable companionship and associated behaviors.

When Joshua was incarcerated for a violation of his probation in February 2012 for a failed urine test prior to his indictment in the instant

matter *(and prior to his indictment on the matter herein)*, for the first time in his life, Joshua consciously decided to gain insight into his past difficulties and criminal conduct and to confront the issues that resulted in his unacceptable behavior.

His decision to begin a path of self-awareness and to avoid recidivist activity was done far before he became aware of the indictment and prosecution in the matter herein and independent to his current request for compassionate sentencing.  Instead, his desire to develop socially appropriate behaviors and choices were driven by a weariness of his own failures and inextricable connection to a self-destructive path.  Joshua's efforts to restructure his pro-social conduct and manner of thought was exemplified by his outstanding behavior during his commitment at Barnstable County House of Corrections, Plymouth County House of Corrections and his self-directed participation in the Barnstable County Sheriff's Office Shock Unit – Residential Substance Abuse Program.  The Shock Program is a six month program where inmates are presented with an accountability model of treatment while living within a military based therapeutic community in order to learn the change from criminal behavior to pro-social behavior. (Exh. 1)

Upon Joshua's successful completion of the Shock Program on December 13, 2013, Roger Allen, the treatment director for the Shock program, noted that "Joshua Gonsalves entered the Shock Program on May 9, 2012 and completed the program on November 9, 2012.  Mr.

Gonsalves has been a well-disciplined and active participant who has attended all mandatory and elective programming.  While there, he attended Anger Management, Meditation, Relapse Prevention Class and Book Club.  He also served as a Mentor to new Community Members and Squad Leader.  Additionally, he was voted Community Member of the Week on numerous occasions.  Mr. Gonsalves has been a role-model for pro-social behavior while in the Shock Program."

Joshua's dedication to avoiding the fate of early mortality or a lifetime in prison is exemplified by his outstanding behavior while incarcerated and his behavior modification goals for the future.  These positive steps all strongly indicate that Joshua – who even in the best of circumstances will not exit prison until he is almost forty-five years old, and will be under federal supervision until he is nearly fifty – is not likely to recidivate.

As stated, the proof that Joshua has taken positive, concrete steps to rehabilitation is palpable: when Joshua was incarcerated on his state probation violation matter, he immediately and on his own accord sought substance abuse and cognitive behavior modification to reverse the course of his own self-destruction.  Similarly, he has remained trouble-free and productive both at the Barnstable County House of Corrections and Plymouth County House of Corrections since being federally detained.

Given these positive prognostic signs and the nature of the offense at issue, a sentence far lower than the advisory guideline range suggested

by Probation will be sufficiently but not greater than necessary to
effectuate the sentencing goals of 18 U.S.C. § 3553 (a).

**2.    The Need for the Sentence Imposed to Promote Certain
Statutory Objectives:**

      **(A)    to reflect the seriousness of the offense, promote
respect for the law, and provide just punishment for
the offense**

The offense conduct here is serious and merits significant
punishment.  In these circumstances, however, the Court should consider
whether a significant sentence of 120 months – a sentence at the high end
of the guideline range were Joshua not deemed a career offender and
within the sentencing objectives of career offender – will be significant
enough punishment which will far better reflect the seriousness of the
defendant's conduct than does the 360 months to life suggested by
Probation's determination of Joshua's offense level and recommended
sentence, namely 25 years suggested by the Government, or 210 to 262
months is mechanically derived from the applicable career offender
sentencing guidelines.  It cannot be seriously argued that, given the
conduct in what appears to be genuine effort by Joshua to learn and apply
mindful cognitive behavior skills to avoiding future criminal behavior, this
Court cannot craft a sentence lower than 210 months but still sufficient
enough to promote respect for the law, both specifically to Joshua and
generally to the public at large.  A sentence of 120 months will keep
Joshua – whose longest state prison state was half of what is being

proposed – in federal prison until his late forties and under criminal justice supervision until at least 50 as a result of his irresponsible decision to again engage in drug distribution activity.  The public's right to just punishment for the offense is vindicated by Joshua's prosecution, conviction and punishment by a sentence so significant.

### (B)    to afford adequate deterrence to criminal conduct

Joshua was never given meaningful guidance and tools in order to get out of the cycle of criminal behavior that has been the hallmark of his adolescence, teens and twenties.  Under the proposed sentence, Joshua will spend at least the next ten years in federal prison, emerging when he is 45.  There can be little doubt that the sentencing and incarceration he will endure, in conjunction with some of the behavior modification tools he is now accessing, provide overwhelming deterrence to any thought of relapse in the future.

As a matter of general deterrence, the efficacy of a sentence longer than 120 months is unsupported.  Additionally, the implications of these psychological effects for parenting and family life can be profound. Joshua has four young children, Derek Gonsalves, (age 8), Christopher Baker (age 2), Jordan Gonsalves (age 8), and Joshua Gonsalves, Jr. (age 2) with Nicole Baker, Crystal Flaherty, and Katelyn Shaw.  He maintains a good relationship with Ms. Shaw, in spite of her testimony against him at trial, and Nicole Baker.  He has a very hostile relationship with Crystal

Flaherty, as was evident at trial, and he is currently involved a contentious custody battle.

Parents who return from periods of incarceration still dependent on institutional structures and routines cannot be expected to effectively organize the lives of their children or exercise the initiative and autonomous decision-making that parenting requires. Those who still suffer the negative effects of a distrusting and hypervigilant adaptation to prison life will find it difficult to promote trust and authenticity within their children. Those who remain emotionally over-controlled and alienated from others will experience problems being psychologically available and nurturant.  Tendencies to socially withdraw, remain aloof or seek social invisibility could not be more dysfunctional in family settings where closeness and interdependency is needed. The continued embrace of many of the most negative aspects of exploitative prisoner culture is likely to doom most social and intimate relations, as will an inability to overcome the diminished sense of self-worth that prison too often instills.  Clearly, the residual effects of the post-traumatic stress of imprisonment and the re-traumatization experiences that the nature of prison life may incur can jeopardize the mental health of persons attempting to reintegrate back into the free world communities from which they came. Indeed, there is evidence that incarcerated parents not only themselves continue to be adversely affected by traumatizing risk factors to which they have been exposed, but also that the experience of

imprisonment has done little or nothing to provide them with the tools to safeguard their children from the same potentially destructive experiences. Greene, S., Haney, C., and Hurtado, A., "Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," *Prison Journal*, *80*, 3-23 (2000).

      c)    **A Compassionate and Fair Sentence is Consistent with the Factors Set Forth in 18 U.S.C. § 3553 (a) and Will Result in a Sentence that is Sufficient, but Not Greater than Necessary, to Effectuate the Purposes of Sentencing**

The Court has broad discretion to question and ameliorate the career offender guideline range where, as here, the consequences of the Sentencing Commission's policy are, unsupported by past sentencing practices, and lead to a result inconsistent with the sentencing goals expressed in 18 U.S.C. § 3553 (a).  Martin, supra, 520 F.3d at 88-96 (approving 91 month downward variation from career offender guideline; "Kimbrough…opened the door for a sentencing court to deviate from the guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission.") See also U.S. v. Bryant, 571 F.3d 147, 153 (1st Cir. 2009)(§ 3553 (a) (factors, in context of "enormous" disparity between career offender and otherwise applicable guideline, justified variance). That discretion is at its apex where a particular guideline appears poorly supported empirically, perhaps suggesting an abdication of the Sentencing Commission's institutional role; in such a case the

sentencing court's institutional advantage makes it far better suited to craft a just sentence.  <u>Kimbrough</u>, <u>supra</u> 128 S.Ct. at 567, 574.  See also <u>Gall</u>, 128 S.Ct. at 598 (recognizing institutional advantage of experienced district court judges who "see so many more Guidelines sentences than appellate courts do")(citing Koon v. United States, 518 U.S. 81 (1996)).

While the Government can sensationalize the defendant's conduct, suggest that its worthy of the subject matter of film or book such as "Bonnie and Clyde" or 'The Godfather", the defendant's conduct and the sad factors that led to it are repeated all day and every day everywhere in this country.  They are not unique, and are unworthy of prolonged years of unnecessary incarceration.  A sentence that would effectively amount to a life sentence defiles our society's guiding spirit of justice, humanity and redemption.  Like many courts, this Court should give limited consideration to the guideline range and instead impose a sentence that more adequately considers all of the goals of sentencing as captured in the 18 U.S.C. § 3553 (a) factors.  Those factors militate a sentence of no higher than 120 months' imprisonment.

### CONCLUSION

For the foregoing reasons, this Court should impose a sentence of 120 months' imprisonment notwithstanding the draconian suggestion of the advisory guideline sentencing range, with a six-year period of supervised release with the specific conditions that mandate substance abuse counseling, emotional intervention, and intensive vocational

supervision.  The Court should impose no fine.  See attached Exhibits 1 –

7.

Respectfully Submitted,
Joshua Gonsalves
By his counsel,

Date: 01/19/15                               /s/ Vivianne Jeruchim_____
                                             Vivianne Jeruchim, Esq.
                                             BBO #547598
                                             Jeruchim & Davenport, LLP
                                             50 Congress St., Suite 615
                                             Boston, MA  02109
                                             617/720-6047

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on January 19, 2015.

Date: 01/19/15                               /s/ Vivianne Jeruchim_____
                                             Vivianne Jeruchim, Esq.